AES:JRS/BW
F. #2020R00270

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

- against -

PETER WEINZIERL,

Defendant.

S U P E R S E D I N G
I N F O R M A T I O N

Cr. No. 20-380 (RPK) (S-1)
(T. 18, U.S.C., §§ 981(a)(1)(C), 1952(a)(3), 2 and 3551 et seq.; T. 21, U.S.C., § 853(p); T. 28, U.S.C., § 2461(c))

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

THE UNITED STATES CHARGES:

At all times relevant to this Superseding Information, unless otherwise stated:

I. Background

A. The Defendant

1. The defendant PETER WEINZIERL was a citizen of Austria. In or about and between 1999 and 2015, WEINZIERL worked for Foreign Bank 1, as defined below, as a member of the managing board, which was in charge of the day-to-day operations of the bank. In or about and between 2016 and 2018, WEINZIERL worked for the bank as a consultant. In or about and between 2010 and 2016, WEINZIERL was a member of the board of directors of Foreign Bank 2, as defined below.

B. Relevant Entities and Individuals

2. Odebrecht S.A. was a Brazilian holding company that, through its subsidiaries and companies in which it was a majority shareholder (collectively "Odebrecht" or the "Company"), conducted business in multiple industries, including engineering, construction, infrastructure, energy, chemicals, utilities and real estate. Odebrecht had its headquarters in

Salvador, state of Bahia, Brazil, and operated in at least 27 other countries, including the United States. Odebrecht maintained bank accounts in the United States, including operating accounts at a bank in New York, New York.

3. The Division of Structured Operations ("DSO") was a secret, stand-alone department created within Odebrecht to allow the Company to make payments that were unrecorded on the Company's books and records, many of which took the form of bribe payments to government officials, political parties and politicians in Brazil and other countries.

4. Foreign Bank 1, an entity the identity of which is known to the United States, was a bank located in Austria. Foreign Bank 1 provided corporate banking services, asset management and other banking and investment services.

5. Foreign Banker 1, an individual whose identity is known to the United States, was the chairman of the supervisory board of Foreign Bank 1.

6. Foreign Bank 2, an entity the identity of which is known to the United States, was a bank located in Antigua and Barbuda ("Antigua") that was owned and controlled by Foreign Bank 1. In or about 2010, Foreign Bank 1 sold its majority interest in Foreign Bank 2 to the DSO and its agents.

7. Brokerage Account 1 was a brokerage account located at a financial institution in the United States.

8. Brokerage Account 2 was a brokerage account located at a financial institution in the United States.

9. Receita Federal do Brasil ("RFB") was the federal revenue service of Brazil and a bureau of Brazil's Ministry of Finance. Among other responsibilities, the RFB was charged with collecting income taxes in Brazil.

III. The Criminal Scheme

A. Overview of the Criminal Scheme

10. Between in or about 2001 and 2016, Odebrecht, through certain of its officers, employees and agents, and together with others, engaged in a massive fraud, bribery and money laundering scheme to, among other things, defraud the government of Brazil by falsely and fraudulently misrepresenting and overstating expenses of its foreign subsidiaries in order to deprive the government of Brazil of more than $100 million in taxes, and to pay hundreds of millions of dollars in bribes to, and for the benefit of, public servants, public officials, political parties, political party officials, political candidates and others in order to corruptly obtain and retain business and to gain advantages and benefits in various countries around the world, including in Panama, Mexico and Brazil.

11. In furtherance of the scheme, Odebrecht and others developed and operated a secret financial structure for moving money around the world. By in or about 2006, the secret financial structure had evolved such that the DSO was more formally established. The DSO effectively functioned as a stand-alone bribe department within Odebrecht. The DSO received funds from various sources and then funneled those funds to the ultimate bribe recipients. To conceal the origin of the funds, and distance Odebrecht from the final beneficiaries, transactions executed by the DSO were layered through multiple levels of offshore entities and bank accounts throughout the world.

12. Beginning in or about 2006 and continuing through at least in or about 2016, Odebrecht and others, including members of the DSO, relied upon foreign financial institutions, including Foreign Bank 1, to transfer funds and take other actions that advanced the criminal scheme.

13. In or about and between 2006 and 2016, Odebrecht owed income taxes to the RFB on its worldwide profits. Odebrecht reported its taxable income, which represented its worldwide profits, to the RFB in annual filings and made tax payments to the RFB each year for the amounts represented as due in these filings.

14. Profits generated by Odebrecht were subject to income tax in Brazil as a part of Odebrecht's overall worldwide taxable income, and such profits were included in Odebrecht's total taxable income reports to the RFB. In calculating and reporting its profits for tax purposes, Odebrecht was entitled to reduce the amount of its taxable income by claiming various legitimate business expenses, such as actual purchases of building materials and payments for professional services utilized in its construction projects around the world.

15. By at least in or about 2006, Odebrecht and others had devised, and were executing, a scheme to fraudulently increase Odebrecht's expenses in order to reduce its taxable income and defraud the government of Brazil, while at the same time enabling Odebrecht and others to transfer money into off-books slush fund accounts (the "Odebrecht Shell Company Accounts") for the purpose of concealing Odebrecht's ownership and control over the funds and furthering and promoting the payment of bribes to foreign officials.

B. <u>Transfers of Operating Funds to Odebrecht Shell Company Accounts</u>

16. In or about 2006 or 2007, Odebrecht opened Odebrecht Shell Company Accounts at Foreign Bank 1, which allowed Odebrecht to move funds out of its official bank accounts and off of its official books and records.

17. Beginning in or about 2010, Foreign Bank 1 began executing back-to-back transactions for Odebrecht that allowed Odebrecht to move funds from its official bank accounts into Odebrecht Shell Company Accounts in Portugal. As an initial step for each back-to-back

transaction, Odebrecht sent millions of dollars by international wire transfer from its U.S. operating accounts in New York, New York to Foreign Bank 1, characterized in documents as a purchase of a guarantee obligating Foreign Bank 1 or another guarantor to pay amounts due to Odebrecht on its overseas public construction projects under certain conditions.

18. Thereafter, within a short period of time and after Foreign Bank 1 obtained a substantial fee, Foreign Bank 1 sent the remaining funds by international wire to an Odebrecht Shell Company Account in Portugal, often through correspondent bank accounts located in New York, New York and elsewhere in the United States, documented by a separate agreement purporting to transfer the guarantee obligation to an Odebrecht Shell Company. By breaking the transfer of funds and the supporting contracts into two parts, Odebrecht was able to record the purchase of the guarantee as a business expense, fraudulently reducing its reported taxable profits to the RFB and adding to its pool of off-books slush funds.

19. In or about and between May 2010 and October 2014, Odebrecht moved over $170 million off its books and out of its bank accounts in New York, New York and elsewhere through Foreign Bank 1 utilizing the back-to-back transactions. The defendant PETER WEINZIERL, as a member of the managing board of Foreign Bank 1, and Foreign Banker 1, as a member of the supervisory board, approved each of the back-to-back transactions.

C. Transfers of Illegal Proceeds to U.S. Brokerage Accounts

20. In or about 2010, the defendant PETER WEINZERL, Foreign Banker 1 and others agreed to a deal to have Foreign Bank 1 sell 51 percent of Foreign Bank 2, which at that time was owned by Foreign Bank 1, to a group including DSO officers and agents. By the end of 2014, Foreign Bank 1 sold all of its shares in Foreign Bank 2 to the group.

21. In or about December 2010, Foreign Bank 2 established Brokerage Account 1 at a financial institution in the United States to enable it to invest funds directly in U.S. securities markets. Foreign Bank 2 used Brokerage Account 1 primarily to invest its own available funds for the benefit of the owners of Foreign Bank 2. Foreign Bank 2's available funds included the aggregate balances of Odebrecht Shell Company Accounts over and above its reserve requirements, as well as funds owned directly by the bank, including banking fees and profits. Foreign Bank 2 sent these funds to Brokerage Account 1 in the United States from its U.S. dollar correspondent account at Foreign Bank 1 through New York, New York correspondent banks. Foreign Bank 2's remaining assets were held as liquid funds in its U.S. dollar correspondent account at Foreign Bank 1. As a member of the board of directors of Foreign Bank 2, the defendant PETER WEINZIERL ratified the establishment and use of Brokerage Account 1 in the United States to invest Foreign Bank 2's deposits and earnings in or around May 2011.

22. From in or about and between December 2010 and May 2016, Foreign Bank 2 sent tens of millions of dollars' worth of wire transfers from Foreign Bank 2 to Brokerage Account 1 to purchase U.S. Treasury securities and corporate stocks and bonds on U.S. exchanges.

23. In or about May 2014, Foreign Bank 2 established Brokerage Account 2 at a financial institution in the United States to invest funds directly in U.S. securities markets for the benefit of the owners of Foreign Bank 2. Foreign Bank 2's available funds included the aggregate balances of Odebrecht Shell Company Accounts over and above its reserve requirements, as well as funds owned directly by the bank, including banking fees and profits. In

or around 2014, Foreign Bank 2 transferred part of the funds invested in Brokerage Account 1 to Brokerage Account 2.

24. On or about December 22, 2014, the defendant PETER WEINZIERL, by having ratified the opening and use of Brokerage Account 1, facilitated, together with others, a transfer of approximately $8,000,000 from Foreign Bank 2, to and through a New York bank, to Brokerage Account 1 as part of the investment of Foreign Bank 2's available funds.

E. Law Enforcement Actions Against Odebrecht and Others

25. In around 2015, Brazilian law enforcement authorities, as part of a criminal investigation, sent an official request to Antigua for Foreign Bank 2's records of Odebrecht Shell Company Accounts used to pay bribes.

26. Beginning in or about August 2015, members of the DSO, Odebrecht agents, and the officers of Foreign Bank 2 began to form a plan to make corrupt payments to one or more senior Antiguan officials to limit or block Antigua's response to the Brazilian official request, in order to protect Foreign Bank 2 and others by concealing evidence of money laundering. The defendant PETER WEINZIERL was subsequently advised of the plan by the Foreign Bank 2 officers and informed Foreign Banker 1 of the plan.

27. In around September 2015, Foreign Banker 1 devised a plan to use Odebrecht's criminal proceeds deposited at Foreign Bank 2 to pay off Foreign Banker 1's personal loans from Foreign Bank 1, in part to improve Foreign Bank 1's reported balance sheet and to protect Foreign Banker 1's country estate in Austria, known as Gut Lehenshofen, from creditors. Foreign Banker 1 asked the defendant PETER WEINZIERL to obtain a loan of EUR 8 million from Foreign Bank 2 in exchange for a EUR 13.8 million mortgage against Gut Lehenshofen to secure the loan.

28. On or about November 4, 2015, the defendant PETER WEINZIERL traveled to Orlando, Florida from Vienna, Austria, in part to meet with officers of Foreign Bank 2. During these meetings, WEINZIERL and the Foreign Bank 2 officers discussed Odebrecht's ongoing plan to make corrupt payments to Antiguan officials and to use criminal proceeds at Foreign Bank 2 to pay off Foreign Banker 1's personal loans using Gut Lehenshofen as collateral. WEINZIERL flew back to Austria from Miami, Florida, on or about November 9, 2015.

F. Continued Transactions in Proceeds

29. During in and around the remainder of November 2015 through January 2016, the defendant PETER WEINZIERL continued to coordinate with Foreign Bank 2 officers by phone and email to effect the pay-off of Foreign Banker 1's personal loans using Foreign Bank 2 deposits and to execute the Gut Lehenshofen mortgage. During the same period, members of the DSO, Odebrecht agents, and the officers of Foreign Bank 2 transferred criminal proceeds on deposit at Foreign Bank 2 in order to make corrupt payments for the benefit of Antiguan officials.

30. During in and about November 2016 through January 2017, the defendant PETER WEINZIERL, together with others, transferred all or nearly all of Foreign Bank 2's assets held in Brokerage Account 2 in the United States to Foreign Bank 1.

31. By early 2017, Foreign Bank 1 took custody of all the remaining assets of Foreign Bank 2 ("Foreign Bank 2 Assets"), which consisted of at least $70 million in proceeds of the back-to-back transactions transferred to Odebrecht Shell Company Accounts at Foreign Bank 2 prior to December 2016. These assets included funds in correspondent accounts and funds and

securities formerly held in Brokerage Accounts 1 and 2, which were transferred from the United States to Austria.

32. In or about December 2017, the defendant PETER WEINZIERL and others arranged for the execution of several assignments of debts owed to Foreign Bank 1 in exchange for Foreign Bank 2 Assets. These debts included personal loans totaling approximately EUR 3.8 million to WEINZIERL and loans totaling approximately EUR 21.3 million for the benefit of Foreign Banker 1. These transfers were done at the direction of Foreign Banker 1, with the assistance of WEINZIERL.

TRAVEL ACT

33. The allegations contained in paragraphs one through 32 are realleged and incorporated as if fully set forth in this paragraph.

34. On or about November 4, 2015, within the Middle District of Florida, the defendant PETER WEINZIERL, together with others, did knowingly and intentionally travel in interstate and foreign commerce with the intent to promote, manage, establish, carry on and facilitate the promotion, management, establishment and carrying on of unlawful activity, to wit: money laundering in violation of Title 18, United States Code, Section 1956, and thereafter did perform and attempt to perform such promotion, management, establishment, carrying on and facilitation of the promotion, management, establishment, and carrying on of such unlawful activity.

(Title 18, United States Code, Sections 1952(a)(3), 2 and 3551 et seq.)

CRIMINAL FORFEITURE ALLEGATION

35. The United States hereby gives notice to the defendant that, upon his conviction of the offense charged herein, the government will seek forfeiture in accordance with

Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of such offense to forfeit any property, real or personal, which constitutes or is derived from proceeds traceable to such offense, including but not limited to:

(a) the real property, together with its respective buildings, appurtenances, improvements, fixtures, attachments, easements and furnishings, situated in the country of Austria, further described as follows: folios (Einlagezahlen) 33, 38. 39, 41, 139, 140 and 113, land register 64211 Rabenwald each, district court Fürstenfeld; folio (Einlagezahl) 121, land register 64207 Obersaifen, district court Fürstenfeld; and folios (Einlagezahlen) 191, 566 and 1038, land register 64209 Pöllau, district court Fürstenfeld, together with all legal and material accessories; also known as “Gut Lehenshofen”; and

(b) any and all rights and interests in the Mortgage Agreement originally dated August 19, 2015, and recorded in Austrian land records as a lien against Gut Lehenshofen on or about December 15, 2015, in the amount our EUR 13,800,000, together with any and all rights and interests in the loan facility and other secured obligations described therein.

36. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third party;

(c) has been placed beyond the jurisdiction of the court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided without difficulty,

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code, Section 853(p); Title 28, United States Code, Section 2461(c))

by: Alixandra Smith, Assistant United States Attorney
JOSEPH NOCELLA, JR.
United States Attorney
Eastern District of New York

by: Michael B. Redmann, Deputy Chief
MARGARET A. MOESER
Chief, Money Laundering, Narcotics
and Forfeiture Section
Criminal Division, Department of Justice

by: Patrick Brown, Trial Attorney
LORINDA LARYEA
Chief, Fraud Section
Criminal Division
Department of Justice